**JONES, BELL, ABBOTT, FLEMING & FITZGERALD L.L.P.**
Craig R. Bockman (State Bar No. 105485)
crbockman@jonesbell.com
Fredrick A. Rafeedie (State Bar No.138422)
farafeedie@jonesbell.com
601 South Figueroa Street, Suite 3460
Los Angeles, California 90017-5759
Telephone:   (213) 485-1555
Facsimile:   (213) 689-1004

Attorneys for Defendants Stuart Elster, Aaron Elster,
8615 Long Beach Blvd., LLC, 7607 St. Bernard, LLC,
1132 West Edgeware, LLC, 2001 West 60th Street, LLC,
Leon Elster, Inc., and Leon Elster, Inc. Defined Benefit Pension Plan

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEON ELSTER, an individual, on behalf of himself and of all other shareholders of the LEON ELSTER, INC., a California Corporation<br><br>        Plaintiff,<br><br>v.<br><br>STUART ELSTER, in individual; AARON ELSTER, an individual; LEON ELSTER, INC., a California corporation; 8615 LONG BEACH BLVD, LLC, a California limited liability company; 7607 ST. BERNARD, LLC, a California limited liability company; 1132 WEST EDGEWARE, LLC, a California limited liability company; 2001 WEST 6OTH ST, LLC, a California limited liability company; ADMINISTRATOR FOR LEON ELSTER, INC. DEFINED BENEFIT PENSION PLAN; and ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE PROPERTY DESCRIBED IN THE COMPLAINT ADVERSE TO LEON ELSTER, INC'S TITLE, OR ANY CLOUD ON LEON ELSTER, INC'S TITLE THERETO; and DOES 1-100,<br><br>        Defendants. | **Case No.  2:22-cv-05728 DMG (JPRx)**<br><br>**APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AS TO COUNTER-DEFENDANT LEON ELSTER; MEMORANDUM OF POINTS AND AUTHORITIES, EXHIBITS, AND DECLARATIONS OF STUART ELSTER AND CRAIG R. BOCKMAN IN SUPPORT THEREOF**<br><br>**Date:**      **August 4, 2023**<br>**Time:**      **9:30 a.m.**<br>**Courtroom:**    **8C** |

LEON ELSTER, INC., California Corporation,

            Counterclaimant,

     v.

LEON ELSTER, an individual,

            Counter-Defendant.

**TO COUNTER-DEFENDANT LEON ELSTER:**

     **PLEASE TAKE NOTICE THAT** that on August 4, 2023, at 9:30 a.m. or as soon thereafter as this matter may be heard before the Honorable Dolly M. Gee in Courtroom 8C of the above-entitled court located at 350 W. 1st Street, Los Angeles, California, Counter-Claimant Leon Elster, Inc. will and hereby does move the Court for the entry of judgment in its favor against Counter-Defendant Leon Elster in the amount of $241,382.82 in addition to costs.

     This Application is made pursuant to Federal Rule of Civil Procedure 55 and the court's order of May 31, 2023 (DKT #41) entering the default of Counter-Defendant as to the counterclaims filed against him.  (Bockman Decl. ¶ 4.)

     This Application will be based upon this notice, the attached memorandum of points and authorities, the files and records in this action, the exhibits and declarations of Stuart Elster and Craig R. Bockman that are attached hereto, and on such further evidence and argument as the Court may consider.

     This Application is made without the occurrence of a conference between counsel for the moving party and the Counter-Defendant Leon Elster pursuant to Local Rule 7-3.  Although counsel for the moving party sought to meet and confer with the Counter-Defendant by sending invitations to Counter-Defendant to meet and confer, Counter-Defendant did not respond.  Counsel for the moving party sent the invitations

1   to Counter-Defendant Leon Elster to meet and confer by both email and regular mail on

2   June 8, 2023.

3   Dated:  June 26, 2023                    **Jones, Bell, Abbott, Fleming &**
                                             **Fitzgerald L.L.P.**
4                                            Craig R. Bockman
5                                            Fredrick A. Rafeedie

6                                            By:   _/S/ Craig R. Bockman_
7                                                   CRAIG R. BOCKMAN
                                             Attorneys for Defendants Stuart Elster, Aaron
8                                            Elster, 8615 Long Beach Blvd., LLC, 7607 St.
                                             Bernard, LLC, 1132 West Edgeware, LLC, 2001
9                                            West 60th Street, LLC, Leon Elster, Inc., and
                                             Leon Elster, Inc. Defined Benefit Pension Plan

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Counter-Defendant Leon Elster is a shareholder and former officer and director of the closely held family corporation Leon Elster, Inc. (LEI).  Counter-Defendant filed this action as the plaintiff alleging various claims against the current officers and other shareholders of LEI, including Stuart Elster and Aaron Elster, among others, contending that the defendants, *inter alia*, breached various duties to the corporation.  Those claims had no merit.

The claims that Plaintiff Leon Elster's alleged in the complaint were dismissed on December 5, 2022, for failure to comply with a court order and for failure to prosecute.  (DKT #31.)

In response to the complaint, LEI filed its answer, denying the substantive allegations, and asserting counterclaims against Counter-Defendant.  LEI's counterclaim asserts four claims for conversion, breach of fiduciary duty, unjust enrichment, and possession of personal property.  The counterclaims allege that Counter-Defendant, while acting as an officer and director of LEI, wrongfully misappropriated for himself various assets of LEI by purchasing those assets with corporate funds, but having the title to the assets put in his name as an individual, rather than being put in the name of LEI who funds were used to acquire the assets.

LEI asserts that Counter-Defendant used LEI funds to purchase certain stock in three companies, but that Counter-Defendant directed that the stock certificates be issued in his name rather than in the name of the LEI, and Counter-Defendant made two loans to a third party with corporate funds, but made himself the lender and payee of the loans rather than having the loans be made by and be payable to LEI even though LEI funds were used to make the loans.  It appears that Counter-Defendant may have purchased the assets with corporate funds in order to avoid having to pay income tax on the corporate funds that were used to acquire the assets, thereby in effect making a distribution of LEI funds to himself that were not designated or identified as income to

him.

The assets that are at issue and the amount of corporate funds that were used to purchase the assets are as follows:

| | |
|---|---|
| Bakhu stock | $25,000 |
| GrowPod stock, 100,000 shares | $50,000 |
| GrowPod stock, 90,000 shares | $45,000 |
| Kush stock | $14,292 |
| Eissa loan 2-9-18 | $23,100 |
| Eissa loan 5-23-18 | $30,500 |
| Total | $187,892 |

Counter-Defendant is not incompetent and is not in the military.  (S. Elster Decl. ¶¶ 31-32.)

## II.    THE APPROPRIATED BAKHU STOCK

In 2017, Counter-Defendant purchased shares of Cape Point Holdings stock from its owners for the amount of $50,000.  (Ex. 4 at 1; S. Elster Decl. ¶ 4.)  Apparently, after the purchase a dispute arose between the sellers of that stock and Counter-Defendant, which resulted in a settlement agreement regarding the Cape Point stock that Counter-Defendant had purchased.  (Ex. 4.)  The settlement agreement provided that the Cape Point stock that Counter-Defendant purchased would be exchanged for 50,000 shares of Bakhu Holdings Corp. stock.  (Ex. 4 at 1; S. Elster Decl. ¶ 4.)  As result of that settlement agreement, certificate No. 3125 for 50,000 shares of Bakhu stock, was issued in the name of Counter-Defendant as an individual.  (Ex. 5; S. Elster Decl. ¶¶ 5-6.)

Although the original Cape Point stock and the replacement 50,000 shares of Bakhu stock were issued in the name of Counter-Defendant as an individual, Counter-Defendant used $25,000 of LEI funds rather than his own funds to purchase those shares. (Ex. 6; S. Elster Decl. ¶ 7.)  Accordingly, LEI is entitled to reimbursed for the $25,000 of its funds that Counter-Defendant used to purchase the Cape Point shares that were later exchanged for 50,000 shares of Bakhu stock that were issued in the name of

Counter-Defendant rather than in the name of LEI.

### III.        THE APPROPRIATED GROW POD STOCK

A.        100,000 Shares of GrowPod

On June 26, 2017, Counter-Defendant agreed to purchase 200,000 shares of Grow Pod Rx, Inc. stock for $100,000. (Ex. 7; S. Elster Decl. ¶ 8.)  Pursuant to that agreement, certificate number 173 for 200,000 shares of Grow Pod stock was issued in the name of Counter-Defendant as an individual. (Ex. 8; S. Elster Decl. ¶ 9.)

Although the GrowPod stock certificate was issued in the name of Counter-Defendant in his individual capacity, Counter-Defendant used $50,000 of LEI funds rather than using all of his own funds to purchase the 200,000 shares that were issued in the name of Counter-Defendant as an individual. (Exs. 9-10; S. Elster Decl. ¶ 10.) Accordingly, LEI is entitled to be reimbursed for the $50,000 of its funds that Counter-Defendant used as part of the purchase price for the shares of GrowPod stock that were issued in the name of Counter-Defendant rather than in the name of LEI.

B.        90,000 Shares of Grow Pod

On February 1, 2018, Counter-Defendant agreed to purchase an additional 300,000 shares of GrowPod stock for $150,000, which amounts to $.50 per share. (Ex. 11; S. Elster Decl. ¶ 11.)  Pursuant to that agreement, certificate number 305 for 300,000 shares of GrowPod stock was issued in the name of Counter-Defendant as an individual. (Ex. 12; S. Elster Decl. ¶ 12.)

Although the GrowPod stock certificate 305 was issued in the name of Counter-Defendant as an individual, Counter-Defendant used $45,000 of LEI corporate funds rather than using his own funds to purchase the 90,000 shares that were issued in the name of Counter-Defendant as an individual. (Ex. 13; S. Elster Decl. ¶ 13.) Accordingly, LEI is entitled to reimbursement for the $45,000 of its funds that Counter-Defendant used as part of the purchase price for the 90,000 shares of GrowPod stock that were issued in the name of Counter-Defendant rather than in the name of LEI.

## IV.    THE APPROPRIATED KUSH STOCK

On December 6, 2017, Counter-Defendant as an individual agreed to purchase 3,831 shares of Kush Bottles, Inc. stock for $7,662.  (Ex. 14; S. Elster Decl. ¶ 14.)   LEI has not been able to find a certificate for the 3,831 shares of the Kush stock issued in the name of LEI.  For that reason, Counter-Claimant believes, consistent with the purchase agreement for the stock which refers to Counter-Defendant as the purchaser in his individual capacity, and consistent with the other similar stock purchases that Counter-Defendant made by using LEI's funds to purchase stock in his own name, that Counter-Defendant had the certificate for the 3,831 shares of Kush stock issued in his name as an individual rather than in the name of the LEI. (S. Elster Decl. ¶ 15.)

The agreement to purchase the 3,831 shares of Kush stock for $7,662 was entered into between Counter-Defendant as an individual, and the seller.  (Ex. 14.) Counter-Defendant used LEI corporate funds rather than his own funds to purchase those shares.  (Exs. 15-16; S. Elster Decl. ¶ 16.)

On January 8, 2018, Counter-Defendant agreed to purchase an additional 652 shares of Kush Bottles, Inc. stock for $1,630.  (Ex. 17; S. Elster Decl. ¶ 17.) Pursuant to that agreement, certificate number 2124 for 652 shares of Kush stock was issued in the name of Counter-Defendant as an individual. (Ex. 18; S. Elster Decl. ¶ 18.)

Although the 652 shares of Kush stock represented by certificate 2124 was issued in the name of Counter-Defendant as an individual, Counter-Defendant used LEI's funds rather than using his own funds to purchase the shares that were issued in Counter-Defendant's name as an individual.  (Exs. 19; S. Elster Decl. ¶ 19.)

On January 8, 2018, Counter-Defendant agreed to purchase 2,000 shares of Kush stock for $5,000.  (Ex. 20; S. Elster Decl. ¶ 20.)   Pursuant to that agreement, certificate number 2122 for 2,000 shares of Kush stock was issued in the name of Counter-Defendant as an individual. (Ex. 21; S. Elster Decl. ¶ 21.)

Although certificate 2122 representing the 2,000 shares of Kush stock was issued in Counter-Defendant's name as an individual, Counter-Defendant used LEI's

corporate funds rather than his own funds to purchase the shares that were issued in his name as an individual.  (Ex. 22; S. Elster Decl. ¶ 22.)

LEI is entitled to be reimbursed for the total $14,292 of its funds that Counter-Defendant used to purchase 6,483 shares of Kush stock that were issued in the name of Counter-Defendant rather than in the name of LEI.  (S. Elster Decl. ¶ 23.)

The counterclaim asserted that Counter-Defendant purchased 10,324 shares of Kush stock using LEI funds.  Further investigation had shown that only the 6,483 shares of Kush stock referred to above were purchased by Counter-Defendant using LEI corporate funds.

## V.    THE 2-9-18 EISSA LOAN

On February 9, 2018, Counter-Defendant entered into a loan agreement with Prince Abrahim Eissa as the borrower pursuant to which Counter-Defendant as an individual agreed to lend Eissa $25,000.  (Ex. 23; S. Elster Decl. ¶ 24.)  Although the loan agreement identified Counter-Defendant as the individual lender, Counter-Defendant funded the loan using, in part, $23,100 of LEI corporate funds. (Ex. 24; S. Elster Decl. ¶ 25.)

Although Counter-Defendant used $23,100 of LEI's funds to fund the Eissa loan rather than using his own funds, LEI has received no payments from Eissa pursuant to or in payment of the loan and loan agreement between Eissa and Counter-Defendant as an individual.  (S. Elster Decl. ¶ 26.)

## VI.    THE 5-23-18 EISSA LOAN

On May 23, 2018, Counter-Defendant entered into another loan agreement with Prince Abrahim Eissa as the borrower pursuant to which Counter-Defendant as an individual agreed to lend Eissa $35,000.  (Ex. 25; S. Elster Decl. ¶ 27.)  Although the loan agreement identified Counter-Defendant as the individual lender, Counter-Defendant funded the loan using, in part, $30,500 of LEI's funds. (Ex. 26; S. Elster Decl. ¶ 28-29.)

Although Counter-Defendant used $30,500 of LEI's funds to make the loan

to Eissa rather than using his own funds, LEI has received no payments from Eissa pursuant to or in payment for the loan or loan agreement between Eissa and Counter-Defendant as an individual.  (S. Elster Decl. ¶ 30.)

## VII. COUNTER-DEFENDANT CONVERTED LEI'S CORPORATE FUNDS TO HIS OWN USE

Conversion is the wrongful exercise of dominion over the property of another.  *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015).  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property converted; (2) the defendant's conversion of that property by a wrongful act or the disposition of the owner's property rights; and (3) damages.  *Id.*

The LEI corporate checks that Counter-Defendant used to acquire the assets at issue demonstrate that LEI was the owner of the funds that Counter-Defendant used to acquire the assets that were given to Counter-Defendant in exchange for LEI's funds that were used to pay for those assets, thereby satisfying the first element of the claim. Those checks drawn on LEI accounts show that LEI was the owner of the funds that Counter-Defendant converted.  (Exs. 6, 9, 10, 13, 15, 16, 19, 22, 24, 26.)

Counter-Defendant converted LEI's corporate funds by using LEI's  funds to acquire the assets, consisting of the stock certificates and the loan repayment obligation, that he then converted to his personal ownership by having the stock certificates issued in his name and by directing that the borrower make the loan repayments to Counter-Defendant rather than to LEI, thereby satisfying the second element of the claim.  (Exs. 5, 8, 12, 14, 18, 21.)  The fact that Counter-Defendant used LEI's funds to acquire assets that he directed be put in his name as an individual, deprived LEI of its funds, thereby satisfing the third element.

As result of Counter-Defendant's conversion of LEI's funds, LEI has been damaged in the amount of $187,892, not including interest.  That amount represents the LEI corporate funds that Counter-Defendant used to acquire for his own personal use and ownership what should have been LEI corporate assets given that LEI funds were

used to acquire the assets.   Counter-Claimant is, therefore, entitled to judgment in its favor in the amount of $187,892, not including prejudgment interest on its first claim for relief.

## VIII.  COUNTER-DEFENDANT BREACHED HIS FIDUCIARY DUTIES TO LEI AND ITS SHAREHOLDERS BY USING CORPORATE FUNDS FOR HIS PERSONAL BENEFIT

The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach.  *Meister v. Mensigner*, 230 Cal. App. 4th 381. 395 (2014).

California Corporations Code section 309(a) requires that a director: [S]hall perform the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."   Cal. Corps. Code § 309(a).   When that duty is breached, the director has breached his fiduciary duties.

> There is a "strong public interest in assuring that corporate officers, directors, majority shareholders and others are faithful to their fiduciary obligations to minority shareholders." Consistent with that interest, "self-dealing in whatever form it occurs should be handled with rough hands for what it is— dishonest dealing. And while it is often difficult to discover self-dealing in ... sale[s] of ... assets or dissolution and liquidation, the difficulty makes it even more imperative that the search be thorough and relentless."

*Id*.

When he used LEI's corporate funds to acquire the assets that he directed be put in his name, Counter-Defendant was an officer and director of LEI.   (S. Elster Decl. ¶ 3.)  As an officer and director of LEI, Counter-Defendant breached his fiduciary

duties when he committed self-dealing by converting LEI's corporate funds in order to acquire assets for his own personal use and benefit.  Counter-Claimant is, therefore, entitled to judgment in its favor in the amount of $212,892, not including prejudgment interest on its second claim for relief.

## IX.    COUNTER-DEFENDANT HAS BEEN UNJUSTLY ENRICHED BY HIS CONDUCT IN USING CORPORATE FUNDS FOR HIS PERSONAL BENEFIT

In general, a person who has been unjustly enriched at the expense of another is required to make restitution to the other.  *Unilogic, Inc. v. Burroughs Corp*. 10 Cal. App. 4th 612, 627 (1992).  "Ordinarily the benefit to the one and the loss to the other are co-extensive, and the result . . . is to compel the one to surrender the benefit which he has received and thereby to make restitution to the other for the loss which he has suffered." *Id*.

Where unjust enrichment has been demonstrated, a plaintiff is entitled to restitution of the amount at issue.  *Welborne v. Ryman-Carroll Found*., 22 Cal.App.5th 719, 725 (2018).

> An individual is required to make restitution if he or she is unjustly enriched at the expense of another . . . .   The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is unjust for the person to retain it. [A] transferee with knowledge of the circumstances giving rise to an unjust enrichment claim may be obligated to make restitution.

*Id*.  "Conversely, the recipient of money who has reason to believe that the funds he or she receives were stolen may be liable for restitution." *Id*. at 726.  If it is determined that one has purloined the funds another, a court can "be called upon to determine whether it was equitable to restore to the [the victim] . . . the amount taken . . . ." *Id*. at 727.

Based on the facts demonstrating that the Counter-Defendant was an officer and director of LEI when he used LEI's corporate funds to acquire the assets at issue and by undertaking such conduct breached his fiduciary duties to the corporation and its shareholders through self-dealing, LEI is entitled to restitution from Counter-Defendant in the amount of $212,892, not including interest. That amount represents the LEI corporate funds that Counter-Defendant used to acquire for his own personal use and ownership what should have been LEI corporate assets given that LEI funds were used to acquire those assets.

Counter-Claimant is, therefore, entitled to judgment in its favor in the amount of $187,892 as restitution for Counter-Defendant's unjust enrichment, not including prejudgment interest on its third claim for relief.

## X.   COUNTER-CLAIMANT SHOULD BE AWARDED PREJUDGMENT INTEREST

While an award of prejudgment interest is discretionary, such recovery is appropriate, because it "serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Barnard v. Theobald*, 721 F.3d 1069, 1078, (9th Cir. 2013).

To the extent that prejudgment interest is awarded, the rate applicable for post-judgment interest is also the appropriate rate for pre-judgment interest, because pre-judgment interest serves the same purpose as does post judgment interest. *Price v. Stevedoring Svcs. of Am, Inc*., 697 F.3d 820, 836-37 (9th Cir. 2012). Interest on money damages is an essential part of compensation because "it ensures that the delay in payment of compensation does not diminish the amount of compensation to which the [victim] . . . is entitled." *Id.* (employee's Longshore Act recovery). "An award of pre-judgment interest at below market rates does not fully compensate the prevailing party and, in addition, tends to ... give[ ] an economic benefit to the debtor." *Id.*

Counter-Claimant has calculated prejudgment interest on each of the six

items of damage from the date of the payment of LEI's funds that Counter-Defendant used to acquire each of the assets at issue, to the date of June 30, 2023, which is the date that this application was filed.  The interest rate used for the prejudgment interest calculation is that provided for by 28 U.S.C. § 1961 as the rate applicable to post-judgment interest as of the week before the filing of this application. (Ex. 27; Bockman Decl. at ¶¶ 2-4.)

For example, for the Bakhu stock, the last LEI payment check for that purchase was dated by the bank as November 30, 2017. (Ex. 6.)  From that date to June 30, 2023, 2037 days have elapsed.  (Ex. 27, column F.)  The daily rate of interest is calculated by taking the amount of the LEI funds used (Ex. 27, column B), multiplying that by the annual rate provided under 28 U.S.C. § 1961 (Ex. 27, column D), and dividing that by 365.  (Ex. 27; Bockman Decl. at ¶¶ 2-4.)

Counter-Claimant has calculated prejudgment interest as totaling $53,490.82.   (Ex. 27, column G.)

## XI.   CONCLUSION

For the foregoing reasons, Counter-Claimant requests that judgment be entered in its favor against Counter-Defendant Leon Elster in the following amount, in addition to costs and post-judgment interest:

| | |
|---|---|
| LEI funds taken | $187,892.00 |
| Prejudgment interest | $53,490.82 |
| Total | $241,382.82 |

Dated:  June 26, 2023

**Jones, Bell, Abbott, Fleming & Fitzgerald L.L.P.**
Craig R. Bockman
Fredrick A. Rafeedie

By:   _/S/ Craig R. Bockman_
      CRAIG R. BOCKMAN
Attorneys for Defendants Stuart Elster, Aaron Elster, 8615 Long Beach Blvd., LLC, 7607 St. Bernard, LLC, 1132 West Edgeware, LLC, 2001 West 60th Street, LLC, Leon Elster, Inc., and Leon Elster, Inc. Defined Benefit Pension Plan

1
2
3

### DECLARATION OF STUART ELSTER IN SUPPORT OF
### APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AS
### TO <u>COUNTER-DEFENDANT LEON ELSTER</u>

4      I, Stuart Elster, hereby declare that:

5         1.    I have personal knowledge of the facts stated herein and would and
6    could testify competently thereto if sworn as a witness.

7         2.    I am and have been since April of 1978 an officer of, and member of
8    the Board of Directors of, Leon Elster, Inc. (LEI). I am currently the President of and a
9    member of the board of directors of LEI.

10        3.    Prior to June 30, 2018, Counter-Defendant, Leon Elster, was an
11   officer and director of LEI and had been an officer and director of LEI since prior to
12   2015.

13   **Bakhu Stock**

14        4.    The books and records of Leon Elster, Inc. (LEI) show that in 2017,
15   Leon Elster (Leon), while acting as an officer and director of LEI, purchased shares of
16   Cape Point Holdings stock from its owners for $50,000. (Ex. 4 at 1.) Attached hereto
17   as Exhibit 4 is a copy of the Settlement Agreement dated July 22, 2019, between the
18   sellers of the Cape Point stock and Leon. It is my understanding from the Settlement
19   Agreement that after the purchase of the Cape Point stock, a dispute arose between the
20   sellers of the Cape Point stock and Leon, which resulted in the Settlement Agreement.
21   The Settlement Agreement provides that the Cape Point stock that Leon had purchased
22   would be exchanged for 50,000 shares of stock in Bakhu Holdings Corp. (Ex. 4 at 1.)

23        5.    It is my understanding, from reviewing the books and records of LEI,
24   that as result of the Settlement Agreement between the sellers of the Cape Point stock
25   and Leon, certificate number 3125, dated August 7, 2019, for 50,000 shares of Bakhu
26   stock was issued in the name of Leon as an individual. Attached hereto as Exhibit 5 is
27   a copy of Certificate 3125.

28        6.    Although it is my understanding from the Settlement Agreement that

1   the original Cape Point stock certificate was issued in the name of Leon as an individual,
2   I have not been able to find a certificate representing those shares.  The replacement
3   certificate number 3125 was issued in the name of Leon, as an individual.  (Ex. 5.)

4          7.    Leon used the corporate funds of LEI rather than his own funds to
5   acquire the shares of Bakhu stock that are represented by certificate number 3125.
6   Attached hereto as Exhibit 6 is a redacted copy of a check, number 9351, dated
7   November 30, 2017, drawn on an LEI corporate account in the amount of $25,000, made
8   payable to "Oz Corporation" that I understand was used by Leon to purchase the original
9   Cape Point stock in 2017, which stock was, pursuant to the Settlement Agreement,
10  exchanged for the 50,000 shares of Bakhu stock that are represented by certificate 3125.
11  **GrowPod Stock**

12         8.    The books and records of LEI show that on June 26, 2017, Leon,
13  while acting as an officer and director of LEI, agreed to purchase 200,000 shares of Grow
14  Pod Rx, Inc. stock for $100,000.  Attached hereto as Exhibit 7 is a copy of the Stock
15  Purchase Agreement dated June 26, 2017, between HSB Holdings Company, the seller
16  of the GrowPod stock, and Leon for the purchase of 200,000 shares of GrowPod stock.

17         9.    It is my understanding that, pursuant to the Stock Purchase
18  Agreement that is Exhibit 7, certificate number 173 for 200,000 shares of GrowPod stock
19  was issued in the name of Leon as an individual.  Attached hereto as Exhibit 8 is a copy
20  of certificate number 173 for 200,000 shares of GrowPod stock, which certificate was
21  issued in the name of Leon as an individual.

22        10.    It is my understanding from reviewing the books and records of LEI,
23  that Leon used the corporate funds of LEI in the amount of $50,000, rather than using
24  all of his own funds, to purchase the shares of the GrowPod stock that are represented
25  by certificate number 173.  Attached hereto as Exhibit 9 is a redacted copy of a cashier's
26  check, ending in number 8960, dated August 2, 2017, made payable in the amount of
27  $50,000 to HSB Holding Company that I understand was used by Leon as part of the
28  purchase price for the 200,000 shares of GrowPod that is represented by certificate 173.

APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AS TO LEON ELSTER

1  Attached hereto as Exhibit 10 is a copy of an LEI bank statement dated August 31, 2017,
2  which shows that a bank counter check drawn on August 2, 2017, in the amount of
3  $50,000 against an LEI corporate account was used to purchase the cashier's check
4  referenced above, ending in number 8960, which Leon used to purchase the 200,000
5  shares of GrowPod stock that are represented by certificate 173.

6          11.    The books and records of LEI show that on February 1, 2018, Leon,
7  while acting as an officer and director of LEI, agreed to purchase 300,000 shares of Grow
8  Pod stock for $150,000. Attached hereto as Exhibit 11 is a copy of the Stock Purchase
9  Agreement dated February 1, 2018, between Holmes and Sturgis, Inc., the seller of the
10 GrowPod stock, and Leon for the purchase of 300,000 shares of GrowPod stock.

11         12.    It is my understanding that, pursuant to the Stock Purchase
12 Agreement that is Exhibit 11, certificate number 305 for 300,000 shares of GrowPod
13 stock was issued in the name of Leon as an individual. Attached hereto as Exhibit 12 is
14 a copy of certificate number 305 for 300,000 shares of GrowPod stock, which certificate
15 was issued in the name of Leon as an individual.

16         13.    It is my understanding from reviewing the books and records of LEI,
17 that Leon used the corporate funds of LEI in the aggregate amount of $45,000, rather
18 than using all of his own funds, to purchase the shares of the GrowPod stock that are
19 represented by certificate number 305. Attached hereto as Exhibit 13 are redacted copies
20 of three checks, numbers 2004, 2002, and 2008, dated March 8, 2018, March 1, 2018,
21 and March 14, 2018, each made payable to Holmes and Sturges Inc. in the amount of
22 $15,000 that I understand were used by Leon as part of the purchase price for the 300,000
23 shares of GrowPod that is represented by certificate 305.

24 **Kush Stock**

25         14.    The books and records of LEI show that on December 6, 2017, Leon,
26 while acting as an officer and director of LEI, agreed to purchase 3,831 shares of Kush
27 Bottles, Inc. stock for $7,662. Attached hereto as Exhibit 14 is a copy of the Stock
28 Purchase Agreement dated December 6, 2017, between Worth Management, Inc., as the

1  seller of the stock, and Leon for the purchase of 3,831 shares of Kush stock.

2        15.    In reviewing the books and records of LEI, I have not been able to
3  find a certificate for the 3,831 shares of the Kush stock issued in the name of LEI.  For
4  that reason, I believe, given the purchase agreement for the stock which refers to Leon
5  as the purchaser, and consistent with the other similar stock purchases that Leon made
6  in which he used LEI's funds to purchase stock in his own name, that Leon had the
7  certificate for the 3,831 shares of Kush stock issued in his name as an individual rather
8  than in the name of the LEI.

9        16.    Leon used the corporate funds of LEI in the amount of $7,662, rather
10  than using his own funds, to purchase the shares of the 3,831 shares of Kush stock that
11  are referred in the Stock Purchase Agreement that is Exhibit 14.  Attached hereto as
12  Exhibit 15 is a redacted copy of a cashier's check, ending in number 7621, dated
13  December 6, 2017, made payable in the amount of $7,662 to Worth Management, Inc.
14  that I understand was used by Leon to pay for the 3,831 shares of Kush stock that are
15  referred to in the Stock Purchase Agreement that is Exhibit 14.  Attached hereto as
16  Exhibit 16 is a copy of an LEI bank statement dated December 31, 2017, which shows
17  that a bank counter check drawn on December 6, 2017, in the amount of $7,662 against
18  an LEI corporate account was used to purchase the cashier's check referenced above,
19  ending in number 7621, which Leon used to purchase the 3,831 shares of Kush stock
20  that are referred to in the Stock Purchase Agreement that is Exhibit 14.

21        17.    The books and records of LEI show that on January 8, 2018, Leon
22  agreed to purchase an additional 652 shares of Kush Bottles, Inc. stock for $1,630.
23  Attached hereto as Exhibit 17 is a copy of the Stock Purchase Agreement dated January
24  8, 2018, between Holmes and Sturgis, Inc. as the seller of the stock, and Leon for the
25  purchase of 652 shares of Kush stock.

26        18.    It is my understanding that, pursuant to the Stock Purchase
27  Agreement dated January 8, 2018, certificate number 2124 for 652 shares of Kush stock
28  was issued in the name of Leon as an individual.  Attached hereto as Exhibit 18 is a copy

1  of certificate number 2124 for 652 shares of Kush stock, which certificate was issued in
2  the name of Leon as an individual.

3      19.    Leon used the corporate funds of LEI rather than his own funds to
4  acquire the 652 shares of Kush stock that are represented by certificate number 2124.
5  Attached hereto as Exhibit 19 is a redacted copy of a check, number 9393, dated January
6  10, 2018, drawn on an LEI corporate account in the amount of $1,630, made payable to
7  Holmes and Sturgis, Inc. that I understand was used by Leon to purchase the 3,831 shares
8  of Kush stock that that are represented by certificate number 2124.

9      20. The books and records of LEI show that on January 8, 2018, Leon
10 agreed to purchase an additional 2000 shares of Kush stock for $5,000. Attached hereto
11 as Exhibit 20 is a copy of the Stock Purchase Agreement dated January 8, 2018, between
12 HSB Holdings Company, Inc. as the seller of the stock, and Leon for the purchase of
13 2000 shares of Kush stock.

14     21.    It is my understanding that, pursuant to the Stock Purchase
15 Agreement dated January 8, 2018, certificate number 2122 for 2000 shares of Kush stock
16 was issued in the name of Leon as an individual. Attached hereto as Exhibit 21 is a copy
17 of certificate number 2122 for 2000 shares of Kush stock, which certificate was issued
18 in the name of Leon as an individual.

19     22.    Leon used the corporate funds of LEI rather than his own funds to
20 acquire the 2000 shares of Kush stock that are represented by certificate number 2122.
21 Attached hereto as Exhibit 22 is a redacted copy of a check, number 9394, dated January
22 10, 2018, drawn on an LEI corporate account in the amount of $5,000, made payable to
23 HSB Holdings Company, Inc. that I understand was used by Leon to purchase the 2000
24 shares of Kush stock that that are represented by certificate number 2122.

25     23.    In the aggregate, Leon used $14,292 of LEI corporate funds rather
26 than his own funds to acquire the 6,483 shares of Kush stock that were issued in his name
27 that are referred to in the Stock Purchase Agreement that is Exhibit 14 and that
28 represented by certificates number 2122  and 2124.

– 18 –

**Eissa Loans**

24.    On February 9, 2018, Leon entered into a loan agreement with Prince
Abrahim Eissa as the borrower pursuant to which Leon as an individual agreed to lend
Eissa $25,000.  Attached hereto as Exhibit 23 are copies of the Note Secured By Deed
of Trust and related Escrow Instructions dated February 9, 2018, between Leon as the
lender and Eissa as the borrower regarding a $25,000 loan.  I found these documents
contained in the books and records of LEI.

25.    Although Exhibit 23 identifies Leon as the individual lender, Leon
used $23,100 of LEI corporate funds to fund the loan.  Attached hereto as Exhibit 24 are
copies of two redacted checks, numbers 9439 and 9442, dated February 9, 2018, and
February 12, 2018, both drawn on an LEI corporate account in the amounts of $2,100
and $21,000, made payable to Prince Abrahim Eissa that I understand was used by Leon
to fund, in part, to fund the February 9, 2018 loan that Leon made to Eissa.

26.    Although Counter-Defendant used $23,100 of LEI's funds to fund
the Eissa loan rather than using his own funds, the books and records of LEI do not show
that LEI has received any payments from Eissa pursuant to or in payment of the February
9, 2018 loan and loan agreement between Eissa and Leon.

27.    On May 23, 2018, Leon entered into a loan agreement with Prince
Abrahim Eissa as the borrower pursuant to which Leon as an individual agreed to lend
Eissa $35,000.  Attached hereto as Exhibit 25 are copies of the Deed of Trust and related
Escrow Instructions referencing a Trust Deed Note Dated dated May 23, 2018, between
Leon as the individual lender and Eissa as the borrower regarding a $35,000 loan.  I
found these documents in the books and records of LEI.

28.    Although Exhibit 25 identifies Leon as the individual lender, Leon
used $30,500 of LEI corporate funds to fund the loan.  Attached hereto as Exhibit 26 are
copies of four redacted checks, numbers 2082, 2088, 2075, and 2077, dated May 23,
2018, June 6, 2018, May 13, 2018 and May 17, 2018, each of which is drawn on an LEI
corporate account in the amounts of $5,000, 18,500, $4,000 and $3,000, made payable

1  to Prince Abrahim Eissa that I understand was used by Leon to fund, in part, the May
2  23, 2018 loan that Leon made to Eissa.  Checks 2082 and 2088 reference a "$35,000"
3  and "$30,000" loan that I understand refer to the loan that is identified by Exhibit 25.

4          29.    Check 2075 refers to an "advance" regarding the February 9, "2017"
5  [sic] note, which I understand was an advance to Mr. Eissa with regard to the February
6  9, 2018 note, but that this amount was later included in the note dated May 23, 2018.
7  Check 2077 refers to an "advance" regarding a "$30,000" loan, which I understand was
8  an advance to Mr. Eissa with regard to the May 23, 2018 note, and which amount was
9  later included in the note dated May 23, 2018.

10         30.    Although Leon used $30,500 of LEI corporate funds to fund the loan
11 to Eissa loan rather than using his own funds, the books and records of LEI do not show
12 that LEI has received any payments from Eissa pursuant to or in payment of the May 23,
13 2018 loan and loan agreement between Eissa and Leon.

14         31.    Counter-Defendant Leon Elster is not an infant.  He is my father.  He
15 is also not, to my knowledge, incompetent.  Leon has stated to me that he is not
16 incompetent.  In response to a request for a conservatorship, in 2021 a judge ruled that
17 Leon is completely competent and able to conduct his own affairs.

18         32.    Counter-Defendant Leon Elster is not in military service.  Leon
19 served in the U.S. Navy during WWII and was discharged from his military service in
20 1945 or 1946.

21

22         I declare under penalty of perjury that the foregoing is true and correct.

23

24 Dated: June 26, 2023,       _____
                                        Stuart Elster
25

26

27

28

APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AS TO LEON ELSTER

**DECLARATION OF CRAIG R. BOCKMAN IN SUPPORT OF APPLICATION
FOR ENTRY OF JUDGMENT**

I, Craig R. Bockman, hereby declare that:

1.    I am an attorney at law duly licensed to practice before all the courts of the State of California, and I am the member of Jones, Bell, Abbott, Fleming & Fitzgerald L.L.P., attorneys of record for Counter-Claimant who has primary responsibility for the handling of this matter on behalf of Counter-Claimant.  I have personal knowledge of the facts stated herein and would and could testify competently thereto if sworn as a witness.

2.    Attached hereto as Exhibit 27 is a copy of an Excel Spreadsheet on which the prejudgment interest is calculated for each of the six items of damage sought by the Application.  The interest has been calculated from the date of the payment of LEI's funds that Counter-Defendant used to acquire each of the assets at issue, to the date of June 30, 2023, which is the date that this application was filed.  The interest rate used for the prejudgment interest calculation is that rate provided for by 28 U.S.C. § 1961 applicable to post-judgment interest as of the week before the filing of the application, which can be found on the Federal Reserve website at: https://www.federalreserve.gov/releases/h15/.

3.    For example, the spreadsheet shows for the Bakhu stock, the last LEI payment check for that purchase was dated by the bank as November 30, 2017.  (Ex. 6.) From that date to June 30, 2023, 2037 days have elapsed.  (Ex. 27, column F.)  The daily interest is calculated by taking the amount of the LEI funds used (Ex. 27, column B), multiplying that by the annual rate provided under 28 U.S.C. § 1961 (Ex. 27, column D), and dividing that number by 365.  The spreadsheet calculates prejudgment interest as totaling $53,490.82.   (Ex. 27, column G.)

4.    On May 31, 2023, the Court filed its order (DKT #41) entering the default of Counter-Defendant Leon Elster as to the counterclaims filed against him by Counter-Claimant Leon Elster, Inc.  The default was entered as to the pleading entitled

Defendants' Answer To Complaint; Counterclaim of Defendant Leon Elster, Inc., which was filed August 8, 2022. (Dkt #8.)

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 26, 2023

_/S/ Craig R. Bockman_
Craig R. Bockman

APPLICATION FOR ENTRY OF DEFAULT JUDGMENT AS TO LEON ELSTER